# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
### AT KNOXVILLE

OFFICE AND PROFESSIONAL )
EMPLOYEES INTERNATIONAL )
UNION, AFL-CIO, LOCAL 2001, )
)
        Plaintiff, )
)
v. )    No.:  3:05-CV-164
)          (VARLAN/GUYTON)
TENNESSEE VALLEY AUTHORITY, )
)
        Defendant. )

## MEMORANDUM OPINION

The Office and Professional Employees International Union, AFL-CIO, Local 2001 ("OPEIU") filed this civil action to compel the Tennessee Valley Authority ("TVA") to arbitrate two related grievances concerning the assignment of certain duties to non-bargaining unit employees. TVA contends that work assignment disputes are not covered by the grievance procedure in the parties' collective bargaining agreement. TVA also argues that OPEIU failed to file this suit within the applicable six-month limitations period.

The parties have filed cross-motions for summary judgment [Docs. 2, 13] and thorough briefs and supporting documentation [Docs. 3, 4, 14, 15, 16, 17, 18, 19, 21, 22, 25] regarding their respective positions. The Court has carefully reviewed the entire record and considered the arguments of counsel presented on December 16, 2005.

For the reasons set forth herein, the defendant's motion for summary judgment [Doc. 2] will be granted to the extent that the Court concludes TVA has not agreed to arbitrate the

grievance at issue and therefore may not be compelled to do so.  Therefore, the plaintiff's

cross-motion for summary judgment [Doc. 13] will be denied.


I.      **Relevant Facts**

The OPEIU is one of the unions representing TVA's white collar, or salary policy,

workforce.  TVA and OPEIU have entered into a collective bargaining agreement consisting

of several documents, the pertinent portions of which are contained in the record.  Under the

terms of Supplementary Agreement 1 to the parties' collective bargaining agreement, TVA

recognizes OPEIU:

> as the exclusive bargaining agent for all employees in positions involving
> management-service functions, both professional and administrative, such as
> budgeting, accounting, legal, reporting, information, procurement, property
> and supply, and other closely related management-service functions, and all
> employees in positions involving general or specialized clerical, secretarial,
> and stenographic functions, office machine and computer operations,
> communications services functions such as printing, telephone operator, and
> photographer work, and service functions relating to park operations,
> excluding all employees covered by other collective bargaining agreements;
> and all employees in positions defined in Sections D and E of [Supplementary
> Agreement 1].  [Doc. 1, Ex. 1 at p. 16.]

[Doc. 4, Hairston Declaration at ¶ 2.][1]

The parties have executed an agreement recognizing the somewhat unique foundation

for the OPEIU-TVA relationship which states in pertinent part:

---

[1]TVA has submitted two declarations of Peyton T. Hairston, Jr. [Docs. 4, 22] with exhibits
in support of their motion for summary judgment.  Mr. Hairston is TVA's Senior Vice President,
Employee Relations and Diversity, having previously served as TVA's Senior Vice President, Labor
Relations.  [Doc. 4 at ¶ 1.]

> TVA and the [OPEIU] recognize that their relationship is established under
> Section 3 of the TVA Act, the "Agreement Recognizing Collective Bargaining
> Rights of Employees and their Collective Bargaining Representatives," the
> OPEIU Collective Bargaining Agreement and Supplementary Agreements, and
> the history of relations between TVA and the labor organizations representing
> salary policy employees, not pursuant to any other legislation not specifically
> applicable to TVA or to any other requirements. The parties agree that the
> unique foundation of this relationship shall be considered in interpreting this
> bilateral Agreement rather than the principles developed for regulated labor
> relations agreements.

[Doc. 5, Ex. A at 2.]

The Engineering Association, Inc. ("EA") is another of the unions representing TVA's white collar, or salary policy, workforce. TVA and the EA have also entered into a collective bargaining agreement. Under the terms of Supplementary Agreement 1 to the TVA-EA collective bargaining agreement, TVA recognizes the EA:

> as the exclusive bargaining agent for all employees in positions involving
> professional engineering, architectural, chemical, economic, and computer
> systems functions, all employees in positions involving professional scientific
> and program planning and administration functions, and all employees in
> positions involving inspection, aide, or technical functions in engineering and
> scientific fields ... .

[Doc. 4 at ¶ 3.]

Prior to the time pertinent to this case, OPEIU and the EA, together with several other unions, made up the Salary Policy Employee Panel, an umbrella organization for all the unions representing TVA's non-management white collar workforce. The Panel unions negotiated as a group. The Panel dissolved in 1997. Since that time, OPEIU and the other white collar unions have negotiated with TVA separately.

3

TVA also has a number of management positions. Management positions are not represented by any union. Such positions are not part of any bargaining unit and are expressly excluded from the bargaining units represented by OPEIU and EA.

The grievance at issue in this case arose from a 1999 reorganization of TVA's Power Service Shops ("PSS"), which is located in Muscle Shoals, Alabama. PSS performs many functions for TVA, most of which are in support of TVA's power plants. This work includes providing engineering assistance to the power plants during outages.

The grievance procedure set out in Supplementary Agreement S-11 of the collective bargaining agreement between TVA and OPEIU provides for arbitration of "a claim of misinterpretation of an express provision in a Supplementary Agreement." [Doc. 1, Ex. 1 at 105.] The grievance at issue was filed on or about November 21, 2000, alleging that TVA had misinterpreted articles S-1:A and S-4:D(1)(a) and (b) of the collective bargaining agreement "by assigning OPEIU bargaining unit work to other schedules or other employees." [Doc. 1, Ex. 2.] The TVA decision rejecting the grievance explains the factual background as follows:

> [In February 1999], PSS had only three engineers. Each engineer was attempting to handle outage packages and templates for three to four outages at one time during outage seasons. This meant handwritten reports were completed at the end of the outages from memory and handed to a clerk for typing and proofing.
>
> In June 1999 [the Manager of PSS] reorganized PSS and more than tripled the number of engineers. He assigned only one engineer to each outage, and he purchased each of them laptop computers and insisted that they handle the work packages, scope, and templates from beginning to end. Needed adjustments were made and the reports were developed daily on the laptops;

4

therefore, the typed reports were ready for the plant customer at the end of each outage. [TVA officials] walked the hearing officer and the OPEIU through a table pointing out which of the aggrieved duties previously performed to some extent by the Grievants were now assigned to other clerical employees, engineers, and managers.

[Doc. 1, Ex. 5 at 2.] In other words, by requiring the engineers, represented by the EA, to prepare their own reports, OPEIU contends that TVA removed work previously performed by members of the OPEIU bargaining unit.

It is worth noting that OPEIU contends that the reassignment was "not a minor or trivial matter," but instead "removed the majority of the principal job responsibilities of the grievants." [Doc. 26 at ¶ 2.][2] As explained by Pope, OPEIU claimed that the work removed from the grievants was within the contractual sphere of the OPEIU and that TVA's unilateral reassignment of the work to non-unit employees was a breach of S-1:A. OPEIU also claimed the reassignment of the grievants' work may have been prompted by their prior use of the grievance procedure to protest their classifications.

After the responsible TVA manager responded to the grievance, OPEIU appealed the matter to Hairston, the next step of the grievance procedure. Hairston initially rejected the grievance by letter dated January 23, 2001, which states in pertinent part as follows:

Issues regarding work assignment or jurisdictional disputes between bargaining units are not subject to resolution through the grievance procedure defined in Supplementary Agreement S-11 of the Articles of Agreement.

---

[2]OPEIU has submitted two declarations of Phillip Pope [Docs. 14, 26] in support of its motion for summary judgment. Mr. Pope is the President of OPEIU Local 2001 and an International Vice-President of OPEIU. [Doc. 14 at ¶ 1.]

Rather, these disputes are to be presented to the Senior Vice President of Labor Relations for final resolution.

[Doc. 1, Ex. 3.]

OPEIU responded to Hairston's initial decision in an April 20, 2001 letter as follows:

> Your interpretation ... relates to S-1-C. The work being grieved is clearly defined in article S-1-A and is not "new or revised classes of work."

[Doc. 5, Ex. C.] After receiving the April 20, 2001 letter of appeal from OPEIU, TVA's Labor Relations Staff scheduled the grievance for a conference under Supplementary Agreement S-11:C.[3] The conference on the grievance was scheduled because of TVA policy to hold a conference under S-11:C on any grievance where there is any claim that TVA has violated specific contract language, as asserted in OPEIU's April 20, 2001 letter, without regard to TVA's views on the grievability of the issue. The grievance was assigned the designation Comtrac 11959.

The grievance conference on Comtrac 11959 was held on August 6, 2001, in Muscle Shoals. At the conference, OPEIU pursued its work assignment claim and also advanced the claim of three OPEIU-represented employees – Berniece Kasmeier, Judy Seal, and Patricia Brown – which arose out of the PSS reorganization. The three individuals challenged

---

[3]S-11:C provides that the decision of the vice president may be appealed to the Manager of Labor Relations who will then have a conference with the interested parties "for the purpose of seeking mediation of the grievance, considering additional information or clarifying the issue or facts." [Doc. 1, Ex. 1 at 105.]

6

management's action in changing their job title and competitive area without posting a vacancy or obtaining a waiver of posting from OPEIU.

The information presented at the grievance conference by TVA showed that as part of the 1999 PSS reorganization, work performed by the three individual grievants was reassigned to other employees within the OPEIU bargaining unit, to employees represented by the EA, and to managers. The work reassigned to managers was minimal, with most of the work going to other clerical employees or to employees represented by the EA.

Based on the information obtained at the conference, Hairston issued TVA's decision on the grievance on September 13, 2001. Hairston's decision found in favor of the three individual grievants and awarded them relief. However, Hairston rejected OPEIU's work assignment claims. His opinion regarding this claim states in pertinent part:

> Regarding the assignment of work to employees under a different collective bargaining agreement, this matter is not subject to the grievance procedure. Cross-contractual work assignment and jurisdictional disputes must be presented to the Senior Vice President of Labor Relations for resolution.
>
> As for the assignment of work to employees on the management schedule, the assignment of bargaining unit work to management employees may be proper where there is good cause, where it is minimal or incidental, where the work is supervisory in nature, or where there is an emergency. I ask that the managers involved in this decision review the aggrieved work to determine if it was properly assigned to the OPEIU. If a review of this work does not resolve this issue, and the OPEIU believes that the employees performing this work should be in the bargaining unit, then the OPEIU may pursue the matter under the terms of Supplementary Agreement S-1:E-2, which articulates the process for the settlement of such disputes. If, however, the OPEIU believes that employees performing this work are properly assigned to the management pay schedule, but that the aggrieved work should be reassigned to the bargaining unit, then consistent with the practice which extends over five decades, assignment of work and

7

jurisdictional questions involving employees in different collective bargaining agreements must be decided by the Senior Vice President of Labor Relations, if not resolved by the parties involved.

[Doc. 1, Ex. 5 at p. 3.]

In a September 18, 2001 letter, OPEIU appealed TVA's September 13, 2001 decision to arbitration. The grievance, as set out in that decision, included both the claim of the three individuals as well as OPEIU's work assignment claim. Importantly, OPEIU's letter simply states that "OPEIU hereby appeals your decision date [sic] September 13, 2001 on grievance comtrac number 11959 to arbitration." [Doc. 1, Ex. 6.] TVA contends that the claim of the three individuals was subject to arbitration since it was covered by the grievance procedure, while the work assignment claim was not. TVA further claims that since it was not clear what issues OPEIU wanted to arbitrate, the Labor Relations Staff proceeded with the arrangements for the arbitration. OPEIU claims that it did not appeal the individuals' claim because OPEIU had prevailed and TVA management was directed to correct the situation. While OPEIU did file a separate grievance regarding the implementation of that remedy, that grievance was processed separately through the grievance procedure and was not consolidated with Comtrac 11959.

It appears undisputed that there was a delay in scheduling the grievance for arbitration due to TVA's work load constraints and there is no allegation that the delay was attributable to OPEIU. Beginning in September 2003, TVA's Labor Relations Staff started discussions with OPEIU about scheduling the arbitration on Comtrac 11959. These discussions lasted

some time due to scheduling conflicts for the Labor Relations Staff, OPEIU, and the arbitrator. The arbitration was scheduled for October 26, 2004.

The Labor Relations Staff also tried to clarify what OPEIU was asking the arbitrator to decide, starting in January 2004. On October 7, 2004, shortly before the scheduled date of the arbitration, Donna Wilson-Renner of the Labor Relations Staff sent a letter to OPEIU explaining that the only arbitrable issue from Comtrac 11959, in TVA's opinion, was the claim of the three individuals. In response, OPEIU told Ms. Wilson-Renner that the only issue to be arbitrated was whether TVA violated the collective bargaining agreement by assigning OPEIU work to management and other collective bargaining units. In other words, OPEIU did not intend to arbitrate the claim of the three individual employees. OPEIU contends it had no reason to believe that TVA was unclear about the issue for arbitration until receipt of Wilson-Renner's "absurd" proposal. [Doc. 14 at ¶ 20.] By letter dated October 14, 2004, TVA then canceled the arbitration based on its position that "the assignment of work to employees covered by different collective bargaining agreements or to management employees is not subject to the grievance procedure. [Doc. 1, Ex. 8.]

OPEIU then filed an agency grievance pursuant to Article III(4) of the collective bargaining agreement for "denial or attempted denial of access to an appeal procedure," provided by the agreement. After TVA rejected that attempt, OPEIU sought to appeal the agency grievance to arbitration. By letter dated November 23, 2004, Mr. Hairston informed OPEIU that it could not "file an agency grievance over this matter nor ... appeal such to arbitration." [Doc. 5, Ex. F.] OPEIU acknowledges that it has never arbitrated an agency

9

grievance under this provision but suggests that it was included in the collective bargaining agreement to avoid litigation such as this lawsuit.

TVA contends that, historically, disputes about the assignment of work between bargaining units have consistently been resolved outside the grievance process by the TVA officials responsible for labor relations. The record contains copies of several decisions submitted by TVA to support this argument.

OPEIU contends that the parties have a past practice of processing work assignment disputes claiming a violation of S-1:A through the S-11 grievance procedure. The record contains several decisions submitted by OPEIU to support that proposition.

## II.    Analysis

### A.    Standard of Review

Under Fed. R. Civ. P. 56(c), summary judgment is proper if "the pleadings, depositions, answers to interrogatories, admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." It is well-settled that unless the parties have clearly agreed to arbitrate the arbitrability issue, it is for a court, and not an arbitrator, to decide in the first instance whether a dispute is to be resolved through arbitration. *Salary Policy Employee Panel v. TVA*, 149 F.3d 485, 489 (6th Cir. 1998). Moreover, the merits of the underlying dispute are irrelevant to resolving an issue of arbitrability. *Id.*

10

B.    Timeliness

TVA argues in part that this suit is untimely because it was filed outside the six-month statute of limitations applicable to suits to compel arbitration.  Specifically, TVA contends that it took "an unequivocal position" that it would not submit OPEIU's work assignment claim to arbitration no later than September 13, 2001 via Hairston's decision denying the underlying grievance.  Thus, TVA's position is that the statute of limitations began to run upon OPEIU's receipt of Hairston's decision and that this suit, filed March 24, 2005, was initiated long after the limitations period had run.  TVA further argues that the continued processing of the grievance on the claims of the three employees until OPEIU clearly abandoned those claims does not change the impact of TVA's refusal to arbitrate the work assignment issues.

OPEIU argues that this suit was timely filed because the union was required to exhaust the contractual grievance-arbitration procedure before filing suit to compel arbitration.  OPEIU contends that Hairston's September 13, 2001 letter did not contain a "clear and unequivocal" statement that TVA would not arbitrate the matter because the September 13, 2001 decision contained similar language to the January 23, 2001 letter with respect to the grievance procedure.  OPEIU also contends that it was not responsible for any confusion by TVA as to the issue being appealed to arbitration and further that TVA's proposed clarification of the issue for arbitration was "preposterous."  OPEIU points out that it relied in good faith on TVA's selection of an arbitrator and a date for the arbitration, *i.e.*, TVA's continued processing of the grievance.  OPEIU further contends that the cases relied

upon by TVA do not support its argument because the limitations period does not begin to run before an initial request for arbitration is made and denied. [Doc. 20.]

Because OPEIU's notice of appeal simply stated that it "hereby appeals [the] decision date September 13, 2001 on grievance comtrac number 11959 to arbitration," TVA suggests that it was reasonable for TVA Labor Relations to assume that OPEIU was appealing the one aspect of Comtrac 11959 subject to arbitration – the three individuals' claims. In other words, because Pope continued to raise questions about the relief awarded the three individuals, TVA continued to believe that OPEIU was pursuing the matter. TVA further points out that it is the OPEIU, not TVA, who controls what issue(s) OPEIU decides to present to an arbitrator. [Doc. 21.]

It is undisputed that the six-month statute of limitations applies to suits brought against TVA seeking to compel arbitration. *International Ass'n of Machinists & Aerospace Workers v. TVA*, 108 F.3d 658, 665-66 (6th Cir. 1997) (relying on *DelCostello v. International Bhd. of Teamsters*, 462 U.S. 151, 171-72 (1983)); *McCreedy v. Local Union No. 971, UAW*, 809 F.2d 1232, 1237 (6th Cir. 1987) ("the six-month [limitations] period found in section 10(b) of the National Labor Relations Act is the most appropriate statute of limitations to be applied in a union suit against a company to compel arbitration"). It is also undisputed that OPEIU filed this suit within six months of TVA's cancellation of the Comtrac 11959 arbitration. The Court further observes that OPEIU does not really dispute that, if the statute of limitations began to run when it received Hairston's September 13, 2001

12

decision, this suit was filed well beyond the six months limitations period. Thus, the issue for resolution is when the statute of limitations began to run.

In addressing this issue in the *Internat'l Ass'n of Machinists* decision, the Sixth Circuit relied on a prior decision holding that the cause of action accrues and the limitations period begins to run "when the union takes an unequivocal position that it will not seek arbitration." *Internat'l Ass'n of Machinists*, 108 F.3d at 667 (quoting *McCreedy*, 809 F.2d at 1236). The Sixth Circuit concluded that the statute of limitations began to run when the IAM's requests for arbitration of four out of five pending grievances were denied. Thus, the statute of limitations began to run one year prior to the filing of the lawsuit in federal court and IAM's claims were time-barred. *Id.*

TVA also relies on the case of *Tennessee Valley Trades & Labor Council v. TVA*, No. CIV-1-87-411 (E.D. Tenn. 1988) (Edgar, J.)[4], as closely on point. In that case, certain unions and individual employees filed suit to compel TVA to arbitrate a dispute about whether those individual employees should be represented by the International Brotherhood of Electrical Workers (IBEW), a member of the Trades & Labor Council, instead of one of the Salary Policy unions. In considering whether the plaintiffs' claims were time-barred, Judge Edgar concluded that "[t]he cause of action to compel arbitration accrued when TVA took, and communicated to the plaintiffs, an unequivocal stand that it would not arbitrate the grievance." [Mem. Op. at 5.] Judge Edgar further found that "TVA took the required

---

[4]A copy of the Judgment and Memorandum Opinion in *Tennessee Valley Trades & Labor Council* is attached to TVA's brief in support of the motion for summary judgment [Doc. 3].

13

unequivocal stand" in a February 4, 1987 letter which included the statement that "[d]isputes over assignment of work cannot be handled under grievance adjustment procedures." [*Id.* at 6.] In a March 9, 1987 letter, the Council acknowledged that TVA had rejected arbitration of this issue. However, since suit was not filed until November 20, 1987, Judge Edgar concluded that it was not timely filed within the six-month limitation period and dismissed the case. [*Id.*]

TVA thus contends that Hairston's September 13, 2001 letter unequivocally notified OPEIU that the work assignment claims were not "subject to the grievance procedure" and had to be decided by TVA's Senior Vice President of Labor Relations. TVA further contends that the continued processing of the grievance as to the three individual employees does not change the impact of TVA's clear statements about the work assignment issues. OPEIU suggests that these authorities are distinguishable because they involved the denial of a request for arbitration. OPEIU points out that TVA agreed to arbitrate Comtrac 11959 and made preparations for arbitration until canceling it on October 14, 2004.

The decisions in *Internat'l Ass'n of Machinists* and *McCreedy* do not specifically answer this question, that is, what constitutes "an unequivocal position" that the employer will not arbitrate. *See McCreedy*, 809 F.2d at 1237. Although TVA clearly and repeatedly maintained that the work assignment grievance was not subject to the contractual grievance procedure, the Court cannot find that Hairston's September 13, 2001 letter constitutes an unequivocal refusal to arbitrate, particularly in light of TVA's subsequent actions. Following receipt of Hairston's letter, OPEIU timely requested arbitration and TVA agreed to set

14

Comtrac 11959 on the arbitration calendar. Hairston's letter could not constitute a refusal to arbitrate because OPEIU had not yet demanded arbitration. Arbitration was not unequivocally denied until the hearing was canceled in October 2004. *See Pace Internat'l Union v. Vacumet Paper Metalizing Corp.*, No. 02-6067, 91 Fed. Appx. 380, 382-383, 2004 WL 68519 at *2 (6th Cir. Jan. 12, 2004) (employer position in grievance response that employee had waived his right to arbitration was premature because union had not yet demanded arbitration); *American Postal Workers Union, AFL-CIO v. United States Postal Serv.*, 372 F. Supp.2d 83, 88-89 (D.D.C. 2005) (employer's placing of dispute on arbitration docket is not synonymous with unequivocal refusal to arbitrate). While TVA contends it reasonably thought OPEIU was appealing the individual grievants' claims to arbitration and OPEIU contends that such a belief is "preposterous," the fact remains that OPEIU filed a general notice of appeal of Comtrac 11959 and TVA accepted it. Not until TVA "clarified" the issue for arbitration in October 2004 and then canceled the arbitration hearing did TVA unequivocally refuse to submit the work assignment grievance to arbitration. Accordingly, because OPEIU filed suit within six months of Hairston's October 14, 2004 letter, the Court finds that this case was timely filed and will proceed to consider the issue of arbitrability.

C.     Arbitrability of the Work Assignment Grievance

TVA argues that it has not agreed to arbitrate OPEIU's work assignment claims and that the arbitrability of such a dispute is specifically excluded from the parties' grievance procedure pursuant to section S-1:C. TVA relies heavily on the Sixth Circuit's decision in *Salary Policy*, 149 F.3d 485 (6th Cir. 1998), and argues that the *Salary Policy* opinion

15

compels a ruling in favor of TVA in this case. OPEIU argues that the work assignment grievance is arbitrable and that TVA's position is based on an unwarranted extension of the *Salary Policy* decision. Thus, a careful review of the *Salary Policy* decision is an appropriate starting point for this Court's analysis.

The *Salary Policy* case involved a dispute as to whether employees within a new job classification created by TVA should be in a bargaining unit represented by OPEIU or one represented by the International Brotherhood of the Teamsters ("Teamsters"). TVA created a new job classification called "warehouseman/driver" or "material handler" which combined clerical duties, traditionally performed by OPEIU-represented employees, and physical handling duties, traditionally performed by Teamsters-represented employees. TVA's Senior Vice President for Labor Relations decided that employees in the new position would be represented by the Teamsters, rather than by the OPEIU. *Id*. at 488.

OPEIU filed a grievance protesting that decision. However, TVA refused to arbitrate the matter on the basis that the dispute concerned a jurisdictional matter involving two different collective bargaining agreements not subject to the grievance process. *Id*. The Salary Policy Employee Panel, of which OPEIU was a member, filed suit to compel arbitration.

After first considering the "unique" relationship between TVA and the unions, the Sixth Circuit noted that the history of relations between TVA and the unions should be considered only where the language of the collective bargaining agreement is ambiguous. *Id*. at 490. The Court further observed that a presumption of arbitrability should not apply

since the arbitration clause at issue was narrowly drawn to be exclusive rather than inclusive. *Id*. The Court also noted that the characterization of the dispute as representational, *i.e.*, what employees the unit represents, or jurisdictional, *i.e.*, the assignment of work to union members, may be difficult to distinguish. *Id*. at 491. Under either analysis, the Sixth Circuit concluded that resolution of this dispute had been specifically reserved to TVA Labor Relations. With particular relevance here, the Sixth Circuit examined a provision of the collective bargaining agreement nearly identical to S-1:C in the present case and concluded that the grievance was not subject to arbitration because "the language of the Collective Bargaining Agreement clearly allows TVA Labor Relations to resolve the dispute at issue here." *Id*. at 493.

TVA urges this Court to reach a similar result, arguing that TVA has merely added new duties to the PSS engineers, employees represented by a separate bargaining unit, and reduced duties for some clerical employees represented by OPEIU. Thus, TVA contends that this revision of duties is not subject to the grievance procedure and must be resolved by TVA Labor Relations as provided in S-1:C.

OPEIU contends that this case does not involve a newly-created job classification as in the *Salary Policy* case, such that TVA's reliance on S-1:C is misplaced. Instead, OPEIU argues that the removal of the grievants' work constituted a misinterpretation of S-1:A, which defines the OPEIU bargaining unit. OPEIU further suggests that the exclusionary language relied on by TVA is ambiguous. Thus, pointing to the historical evidence

submitted, OPEIU argues that work assignment disputes have been repeatedly resolved through the S-11 grievance procedure.

In reply, TVA first argues that Judge Echols of the Middle District of Tennessee has rejected OPEIU's similar reliance on the bargaining unit definition in *Salary Policy Employee Panel, et al. v. TVA*, No. 3-94-0389 (M.D. Tenn. April 3, 1995) [Doc. 21, Ex. 1]. In that case, OPEIU filed suit to compel TVA to arbitrate the assignment of certain duties to warehousemen, represented by OPEIU, rather than material clerks, represented by the Teamsters. Judge Echols relied on *Local 58, Internat'l Bhd. of Elec. Workers v. Southeastern Mich. Chapter, National Elec. Contractors Ass'n*, 43 F.3d 1026, 1032-33 (6th Cir. 1995), where the Sixth Circuit held that clauses determining "what employees the unit represents" are distinguishable from jurisdictional clauses encompassing the "assignment of work to union members." [Doc. 21, Ex. 1 at 3.] Thus, Judge Echols concluded that the provisions relied upon by the OPEIU "do not provide that property and supply work will be given only to workers currently represented by the OPEIU; they merely state that employees performing such work will be represented by the OPEIU." *Id.* While the provisions relied upon by OPEIU describe the type of job position which are to be represented by the union, they do not "prohibit or restrict the Defendant in making work assignments to its employees." *Id.* at 3-4.

With respect to this argument, the Court agrees with TVA that the definition of the bargaining unit in S-1:A simply provides that employees "in positions involving general or specialized clerical, secretarial, and stenographic functions" will be represented by the

OPEIU. This provision does not preclude employees outside of the OPEIU bargaining unit from performing clerical duties.

With respect to TVA's primary argument, S-1:C states as follows:

> Disputes with respect to the assignment of new or revised classes to defined bargaining units, the establishment of classes not assigned to any bargaining unit, or the designation of excluded classes will be resolved by the TVA official responsible for Labor Relations.

[Doc. 1, Ex. 1 at 16.] It is undisputed that TVA has not created a new job classification or position. Thus, the issue is whether the dispute involves a "revised class" such that it is excluded from the contractual grievance procedure.

The Court initially notes that the phrase "or revised" in S-1:C was not present in the nearly identical contract provision in the *Salary Policy* case before the Sixth Circuit. Instead, in that case, S.A. 1:C provided that "[d]isputes with respect to the assignment of new classes to defined bargaining units, the establishment of classes not assigned to any bargaining unit, or the designation of excluded classes will be resolved by Labor Relations." 149 F.3d at 492. It also appears that the parties to the *Salary Policy* case agreed that S.A. 1:C referred to "new classes 'of work' and not to new classes 'of positions.'" *Id.* at 493 n.11. Thus, in its analysis, the Sixth Circuit replaced "new classes" with the term "work" and concluded that "'[d]isputes with respect to the assignment of work' refers not only to disputes over the assignment of new classes of work but as well to disputes over the non-assignment of new classes of work." *Id.* at 493.

The Court notes that the parties have not made such an agreement in this case, *i.e.*, agreeing that the term "classes" in S-1:C refers to classes "of work" rather than classes "of positions." Nor is the term "classes" explicitly defined by any provision of the collective bargaining agreement contained in the record. The Court further observes that neither party specifically addresses how the term "classes" should be interpreted in this case, although TVA seems to suggest that "revised classes" includes revised duties in a job classification. Section S-1:C also contains the phrases "classes not assigned to any bargaining unit" and "excluded classes," which suggest that "classes" may refer to job classifications or job duties.

Section S-1:C is immediately preceded by section S-1:B, entitled "Classes and Positions in Defined Bargaining Units." S-1:B provides that:

> TVA maintains a list of classes included in the defined bargaining units. TVA assigns new classes of work to the appropriate bargaining unit based on related work.

[Doc. 1, Ex. 1 at 16.] Thus, within S-1:B, the term "classes" is used to reference both job classifications and job duties or classes "of work." The Court therefore concludes that the opening phrase of section S-1:C "new or revised classes," when read in context with the proceeding provision, means "new or revised classes *of work*." Because this language is unambiguous, the Court need not reconcile the evidence of historical relations between the parties. The Court is in agreement with the *Salary Policy* interpretation and application of this contractual language. S-1:C allows TVA Labor Relations to resolve the dispute at issue here and TVA is entitled to summary judgment on this issue.

D.    The Agency Grievance

TVA's final argument concerns the "agency grievance" filed by OPEIU pursuant to Article III(4) of the collective bargaining agreement.  In light of the Court's conclusion that TVA cannot be compelled to arbitrate the grievance at issue and OPEIU's failure to contest this issue, the Court concludes that this issue is moot and need not be addressed.

**III.    Conclusion**

For all the reasons set forth above, TVA's motion for summary judgment [Doc. 2] will be granted.  The Court concludes that this case was timely filed, but that TVA has not agreed to arbitrate the grievance at issue and therefore may not be compelled to do so.  OPEIU's cross-motion for summary judgment [Doc. 13] will therefore be denied and plaintiff's claims will be dismissed with prejudice.  An order reflecting this opinion will be entered.

s/ Thomas A. Varlan
UNITED STATES DISTRICT JUDGE

21